Receipt number AUSFCC-10162213

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JEFFREY ESSMANN; SUMMERHILL FARMS; MARK LOWE; BRETT NEDENS; SHAWN NEDENS; MIKE PARNELL; DALE NUNEZ; JOHN MEHLING AND ELIZABETH MEHLING; FRANCINE SVAREN; JEFF WAGNER; PAUL FITZGERALD; LOWER BIGHORN LAND AND CATTLE COMPANY, LLC; NINEMILE LAND AND CATTLE COMPANY, INC.; JOSEPH ERPELDING; JC RIVER RANCH LLC; CHAD OULLETTE; JAMES BENNETT; DIAMOND B COMPANIES, INC.; FRED BORMAN; CIRCLE B, LLC,<br><br>    Plaintiffs,<br><br> v.<br><br>UNITED STATES OF AMERICA<br><br>    Defendant. | 25-143 L |

**COMPLAINT**

**NATURE OF THE CLAIM**

1. Plaintiffs bring their claims for a taking of their land and other property without just compensation, by means of a significant and deliberate acts by the U.S. Bureau of Reclamation and the US Army Corps of Engineers (collectively "Bureau") departing from policies and practices regarding the management of the Bighorn River ("the River"). Specifically, in order to provide recreational

opportunities the Bureau departed from its longstanding management policies and practices when it knew that the direct, natural, probable and foreseeable result of that departure would be severe flooding of Plaintiffs' land and property.

2. The Bureau foresaw that its departure from its longstanding policies and practices would result in a severe invasion of Plaintiffs' property, appropriating Plaintiffs' rights therein.

3. As a direct, natural, probable and foreseeable result of the Bureau's departure from its flood-control policies and procedures, Plaintiffs' lands have been subjected to flooding. This flooding substantially impacted and destroyed Plaintiffs' land and property, depriving them of its use and enjoyment for extended periods of time and, in some cases, permanently.

4. But for the Bureau's departure from its policies and procedures, most if not all of this flooding would not have occurred at all.

5. The flooding caused by the Bureau imposed a severe burden on Plaintiffs' land and other property, profoundly disrupting and interfering with Plaintiffs' reasonable, investment-backed expectations regarding the intended and customary use of that land and other property.

6. The Bureau's practices have sacrificed Plaintiffs' land and other property, without compensation.

## JURISDICTION AND VENUE

7. This Complaint states causes of action for taking of property without

just compensation in violation of the Fifth Amendment to the United States Constitution. The Court has jurisdiction over this action under 28 U.S.C. § 1491(a).

8. Venue is proper in the United States Court of Federal Claims pursuant to 28 U.S.C. § 1491(a).

## PARTIES

9. The Plaintiffs are farmers or other legal entities who own and/or operate farms on and near the Bighorn River downstream of Yellowtail Dam.

10. Plaintiff Jeffrey Essmann, dba Summerhill Farms, was deprived of use and enjoyment of his land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

11. Plaintiff Mark Lowe was deprived of use and enjoyment of his land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

12. Plaintiff Brett Nedens was deprived of use and enjoyment of his land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

13. Plaintiff Shawn Nedens was deprived of use and enjoyment of his land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

14. Plaintiff Mike Parnell, dba Pale Morning Dun Ranch, was deprived of use and enjoyment of his land due to flooding in 2023 caused by the Bureau releasing

water from the Yellowtail Dam.

15. Plaintiff Dale Nunez was deprived of use and enjoyment of his land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

16. Plaintiffs John Mehling and Elizabeth Mehling were deprived of use and enjoyment of their land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

17. Plaintiff Francine Svaren was deprived of use and enjoyment of her land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

18. Plaintiff Jeff Wagner was deprived of use and enjoyment of his land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

19. Plaintiff Paul Fitzgerald, dba Lower Bighorn Land and Cattle Company and Nine Mile Land and Cattle Company, was deprived of use and enjoyment of his land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

20. Plaintiff Roger Ruhurek was deprived of use and enjoyment of his land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

21.     Plaintiff Joseph Erpelding, dba JC River Ranch LLC, was deprived of use and enjoyment of his land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

22.     Plaintiff Charles Caturia was deprived of use and enjoyment of his land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

23.     Plaintiff Chad Oullette was deprived of use and enjoyment of his land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

24.     Plaintiff James Bennett, dba Big Horn Tulloc Association and Diamond B Companies, Inc., was deprived of use and enjoyment of his land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

25.     Plaintiff Fred Borman, dba Circle B LLC, was deprived of use and enjoyment of his land due to flooding in 2023 caused by the Bureau releasing water from the Yellowtail Dam.

26.     Defendant is the United States of America

## BACKGROUND

27.     The Bighorn River originates in the Wind River Mountains of Wyoming and flows north approximately 461 miles to its confluence with the Yellowstone River in Montana.

28.     The Bighorn River and Yellowstone River are in the Missouri River Basin.

29.     In early recorded history the Bighorn River was subject to periodic seasonal flooding.

30.     In 1929, the Bureau of Reclamation and the Army Corps of Engineers turned their attention to flood control in the Missouri River Basin and began comprehensive studies of the principal river basins in the watershed.  Beginning in the 1930s, the federal government began constructing dams along the main stem of the Missouri River. Construction of the first dam, the Fort Peck Dam in northeastern Montana, commenced in 1933.

31.     In 1944, Congress passed the Flood Control Act of 1944, commonly known as the Pick-Sloan Act. The Pick-Sloan Act authorized the construction of a series of dams, reservoirs, and levees in the Missouri River Basin.

32.     The Pick-Sloan Act authorized construction of the Yellowtail Dam.

33.     Construction on the Yellowtail Dam began in 1961 and was operational in 1966.

34.     The Yellowtail Dam is named for Robert Yellowtail, Crow Tribal Chairman during the 1940s. Robert Yellowtail was adamantly opposed to construction of the dam and was opposed to the Crow Nation selling the dam site to the federal government.

35.     The Yellowtail Dam's hydroelectric plant has a capacity of 250 megawatts, with four 62,500 kilowatt generators.

36.     Releases from the hydroelectric plant vary drastically to meet peak

electricity demand.

37.  The Yellowtail Afterbay Dam is about 2 miles downstream from the Yellowtail dam. The Yellowtail Afterbay Dam regulates the fluctuating discharge from the Yellowtail dam and releases a more constant flow into the Bighorn River.

38.  The Yellowtail Dam is 525 feet high and 1480 feet wide. It created a reservoir about 70 miles long in the Bighorn River now referred to as Bighorn Lake.

39.  The purposes of the Yellowtail Dam are primarily flood control, electricity generation, and irrigation development.

40.  The Bighorn Canyon National Recreation Area was designated in 1968 by PL 89-664.

41.  The Bureau is responsible for managing the Yellowtail Dam to fulfill the primary project purposes flood control, electricity generation, and irrigation development.

42.  Congress recognized in 1944 that people would not adequately settle and invest in the Missouri River Basin without the government offering the inducement of protection from flooding: "If human beings are going to live and carry on their daily activities in the fertile valleys of our rivers, their lives and property must be protected. Local inhabitants and returning soldiers must have a sense of security if they are going to live in peace, build permanent homes, and contribute their share to the national welfare. Moreover, industry cannot afford to venture into an area

where overflow is expected annually, regardless of how attractive other conditions may be."

43. The government also recognized that its goals of promoting increased population and the development of agriculture and industry in the Missouri River Basin might require sublimating competing interests in recreation or otherwise: "It is, for example, the view of the Bureau of Reclamation, that the waters of the River and its tributaries west of or entering above Sioux City are more useful to more people if utilized for domestic, agricultural, and industrial purposes than for navigation-improvement purposes. To the extent that these uses are competitive, domestic, agricultural, and industrial uses should have preference."

44. Farmers, including Plaintiffs here, were induced to invest in farmland and other economic development in reliance on federal flood control.

45. The government knew that flooding posed a serious risk to farming, limiting the willingness of farmers to invest further in developing the Basin, and chose to control flooding to promote farming because farming was deemed essential to the economic development of the Missouri River Basin. Flood control was, therefore, given the highest priority in the Bureau's river management decisions and was codified as such in the Master Manual.

46. Despite the Bureau's directive to prioritize flood control, the Bureau has de-emphasized flood control in favor of other competing interests in management of the Yellowtail Dam.

47. In June 2023, the Bureau deliberately caused a significant amount of water to be rapidly released from the Yellowtail Dam and Yellowtail Afterbay Dam.

48. These releases of water flooded Plaintiffs' properties and damaged Plaintiffs' properties.

## COUNT 1

**The Bureau Took Plaintiffs' Land and Property without Just Compensation in Violation of the Fifth Amendment of the United States Constitution**

49. Plaintiffs hereby incorporate all previous paragraphs.

50. The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." The purpose of this Fifth Amendment provision is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.

51. Plaintiffs have a legally-recognized property interest in their land and other property, and the economic benefits associated with that property.

52. Plaintiffs had distinct, reasonable, investment-backed expectations that their property would only be subject to flooding in line with historical flooding patterns established over the past six decades of the Bureau's policies and procedures for management of Yellowtail Dam.

53. The Bureau knew or should have known that its release of water in June

2023 would result in increased flooding, increased risk of flooding, and increased severity and duration of flooding of Plaintiffs' land and property.

54. Such increased flooding, increased risk of flooding, and increased severity and duration of flooding of Plaintiffs' land and property was the direct, natural, probable, and foreseeable result of the Bureau's actions.

55. The increased flooding, increased risk of flooding, and increased severity and duration of flooding of Plaintiffs' land and property has interfered with Plaintiffs' property interests for a substantial period of time and, in some instances, permanently destroyed Plaintiffs' property or permanently deprived Plaintiffs of the use and enjoyment of their property.

56. The Bureau took flowage easements over Plaintiffs' land without just compensation.

57. The Bureau took Plaintiffs' property for a public purpose.

58. The Bureau's actions are attributable to the United States.

59. The United States government has not provided Plaintiffs with just compensation for its taking of Plaintiffs' property.

60. Plaintiffs are entitled to receive just compensation for the property taken due the Bureau's actions.

61. Plaintiffs are entitled to reimbursement of their reasonable expenses, costs and attorney's fees under the provisions of 42 U.S.C. § 4654(c).

# RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment on their behalf, against the Defendant, adjudging and decreeing:

1. Defendant took Plaintiffs' property without just compensation in violation of the Fifth Amendment of the United States Constitution;

2. Judgment be entered against the Defendants and in favor of Plaintiffs for compensation for the property right taken from them, together with the costs of suit, including reasonable attorneys' fees;

3. Plaintiffs be awarded just compensation for their deprivation and losses, as follows:

For Mark Lowe, a money judgment for just compensation in the sum of not less than $140,339;

For Brett Nedens, a money judgment for just compensation in the sum of not less than $113,398;

For Shawn Nedens, a money judgment for just compensation in the sum of not less than $229,050;

For Chad Oullette, a money judgment for just compensation in the sum of not less than $156,626;

For Jeffrey Essmann and Summerhill Farms, a money judgment for just compensation in the sum of nsot less than $108,880;

For Jeff Wagner, a money judgment for just compensation in the sum of not less than $175,009;

For Mike Parnell, a money judgment for just compensation in the sum of not less than $100,000;

For Dale Nunez, a money judgment for just compensation in the sum of not less than $50,000;

For John and Elizabeth Mehling, a money judgment for just compensation in the sum of not less than $40,000;

For Francine Svaren, a money judgment for just compensation in the sum of not less than $100,000;

For Paul Fitzgerald, Lower Bighorn Land and Cattle Company, and Nine Mile Land and Cattle Company, a money judgment for just compensation in the sum of not less than $250,000;

For Joseph Erpelding and JC River Ranch LLC, a money judgment for just compensation in the sum of not less than $300,000;

For James Bennett and Diamond B Companies, a money judgment for just compensation in the sum of not less than $100,000;

For Fred Borman and Circle B LLC, a money judgment for just compensation in the sum of not less than $40,000.

4. Other such further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

Dated this 26th day of January, 2025.

        /s/Timothy M. Bechtold
        BECHTOLD LAW FIRM, P.L.L.C.
        PO Box 7051
        Missoula, MT 59807
        406-721-1435
        tim@bechtoldlaw.net

        John Heenan
        HEENAN & COOK
        1631 Zimmerman Trail
        Billings, MT 59102
        Telephone: (406) 839-9091
        john@lawmontana.com